ORIGINAL

FILED
CLERK

2015 OCT 16  PM 3: 44

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                 :

JACOB FETMAN,
                      Plaintiff,   :

                                   :

- against -                       :

VICTOR LIPNITSKY and STOUT RISIUS :
ROSS, INC. and JOHN DOE 1-15     :

                                 :

                   Defendants,  :
-------------------------------------------------------X
    I

**AMENDED COMPLAINT**

15 Civ. 5543 (BMC)(LB)

**Jury Trial Demanded**

## I. Parties in this complaint:

Plaintiff Name: Jacob Fetman
Street Address: 1743 Ocean Ave.
County, City:  Kings, Brooklyn
State & Zip Code: NY, 11230
Telephone Number 646-261-0200

Vs.

Defendant No. 1 Name: Victor Lipnitsky
Street Address: 2500 Hal Circle
County, City : Baltimore
State & Zip Code:  MD, 21209-2622
Telephone Number: 410-484-0027

Defendant No. 2 Name: Stout Risius Ross, Inc. (as successor to Invotex)
Street Address: 100 International Drive 23rd Fl.
County, City : Baltimore
State & Zip Code:  MD
Telephone Number: 410-775-4080

Defendants No. 3-18 Name: John Doe 1-15.

## II. Basis for Jurisdiction:

The jurisdiction of the Court is invoked pursuant to Federal Question pursuant to the following:

18 U.S.C. §§ 1961  Civil Rico

18 U.S. Code § 1030 - Fraud and related activity in connection with computers

18 U.S. Code Chapter 41 – Extortion and threats

Crossing state lines with intent to commit a crime.

Jurisdiction is also pursuant to Diversity of Citizenship

Plaintiff(s) state(s) of citizenship is New York

Defendant 1 Victor Lipnitsky state of citizenship MD
Defendant 2 Stout Risius Ross, Inc. state of citizenship MD
Defendants 3-18 John Doe 1-15 states of citizenship NY, NJ, MD, others.
The claim is for more than $75,000

## III. Statement of Claim:

A: Claim based on events which occurred in Brooklyn, NY; New York, NY; Passaic, NJ; Baltimore, MD and other states.

B: Events which began on or about Aug 15, 2013, through present.

C: Facts:
1. In late August and Sept. of 2013, Aish HaTorah New York, Inc. was facing a financial crisis. Aish HaTorah was projected to lose over a million dollars because of fallen donation revenues. To lessen expenses, Kenneth Greenman, Executive Director of Aish, attempted to re-negotiate the lease on the organization's rented main offices in Times Square. Greenman was rebuffed by Mr. Grossman, the owner of the location and was told that I signed a lease extension. Because I had a much better relationship with Mr. Grossman, I told Greenman to allow me to negotiate with Grossman.
2. Greenman at this point directed the IT person in the office to have all my emails forwarded to Greenman. As I had only one email address which I used for business and personal, all my personal and financial information became available to Greenman.

3. Greenman was dismayed to find that I was directing investments for another organization, called Merkaz the Center, Inc. of which my wife is the Exec. Director. The size of the investment account was about $2.4 million dollars.

4. Greenman argued with me about the legitimacy of the lease I had signed on behalf of Aish NY– and claimed that I must pay out the rental from my own money. As I was the signer on the lease for the previous 9 years, I vehemently disagreed.

5. Greenman then instructed me to contact Rabbi Cohen and ask him for a religious ruling. I did so by sending the question, via fax, to Rabbi Cohen (**EXHIBIT 1**). Rabbi Cohen then called me to ask that I contact all relevant parties and convene an arbitration session.

6. On Sunday, October 13, 2013, I attended a Jewish arbitration session in front of a sole arbitrator, Rabbi David Cohen of Brooklyn, NY. At the beginning of that meeting, I signed an arbitration agreement which allowed Rabbi Cohen to adjudicate the matter between Jacob (Yaakov) Fetman and Kenneth (Yitzchok) Greenman (**EXHIBIT 2**). I was under the assumption that we were to discuss the lease question, as the formal question was forwarded to Rabbi Cohen days before this initial session was to take place.

7. At that initial meeting, an allegation was made by Kenneth Greenman that I was colluding in some way with Aish Hatorah NY's landlord, Sam Grossman, because of our close relationship. Rabbi Cohen was told by Greenman that I had signed the lease on the premises rented by Aish Hatorah NY on my own, without his permission, and also that he believed that I took financial advantage of Aish Hatorah. Greenman's only basis for this accusation was, in his words, "How could Jacob possibly be so wealthy?"

8. When Greenman made the allegations of financial misdeeds, Rabbi Cohen suggested that a forensic accountant by the name of Victor Lipnitsky, be brought in. He'd had previous experience with him and knew him to be professional and trustworthy. However, I have since realized that Mr. Lipnitsky was a vital premeditated accessory to the entire conspiracy and fraudulent proceedings. At that point, however, I had no objections and in fact encouraged an outside accountant to review the books to prove my innocence. While it appeared odd that a forensic accountant from Baltimore, MD, would be brought in to review the books of Aish Hatorah NY, I had no objection to a step that I felt would exonerate me.

9. Prior to our 2nd arbitration session, which was scheduled for October 22nd, I met once with Victor Lipnitsky in my office. I gave him full access to Aish records, files and paperwork. I explained in detail the way that Aish was handling the accounting of certain 'affiliates' such as Project Inspire, Aish UK, Aish Jerusalem, Aish Toronto and the Aish Center. I also

explained, in detail, the intricacies of our payroll system and how executive compensation was paid out. Mr. Lipnitsky seemed as if he were aware of the way Orthodox Jewish organizations were run and he told me that as an Orthodox Jew himself, he understood, and had personal knowledge of how religious Jewish programs operate.

10. However, on October 22nd, 2013, at the next session with Rabbi Cohen, the conspiracy, fraud and deception began. I was instructed by Rabbi Cohen to have my wife come in to this session. It was attended by me, my wife, Rabbi Cohen, Kenneth Greenman, Stuart Schabes, an attorney representing Aish HaTorah (also an Orthodox Jew from Baltimore, MD) and Victor Lipnitsky.

11. The meeting began with a forceful accusation leveled against me by all Aish representatives, led by Rabbi Cohen. I was accused of taking advantage of, and taking more compensation than I was entitled to, from the organization. I was never given a chance to explain or defend myself, because they then began to harass my wife and tell her what an abominable person she was married to.

12. It was immediately apparent that Mr. Lipnitsky was brought in to lend an air of legitimacy and credibility to the Aish NY accusations of theft. It was also very clear that Rabbi Cohen was not an objective outsider, but was trying to shield Aish HaTorah, Kenneth Greenman and others from the disastrous ramifications of any authorities coming in to investigate the organization and its accounting practices.

13. My wife and I were specifically told to keep quiet about these proceedings because otherwise, our daughter's pending marriage would be derailed by Rabbi Cohen and Greenman and that I would be publicly humiliated and shamed in our community. I would then be excommunicated and labeled a 'Moser'- a whistleblower; an extremely derogatory label for a Religious Jew.

14. At that meeting my wife was emotionally assaulted and verbally harassed. She was told that she was married to a thief and a detestable human being. My wife was reduced to tears and was in terrible anguish. All of that occurred less than 4 weeks before our daughter's wedding.

15. At the end of this distressing session, my wife and I were also directed by Rabbi Cohen to release our personal credit reports to Mr. Lipnitsky to better allow him to investigate the accusations.

16. Rabbi Cohen also strongly insisted that my wife and I attend marital counseling with one of his friends, Mr. Yoel Lipsitt, another Orthodox Jew. At these sessions, Mr. Lipsitt kept

asking for more detailed financial information about our holdings and later on admitted to me that he relayed this information to Rabbi Cohen, violating our privacy. Rabbi Cohen confirmed receiving reports from Mr. Lipsitt. (**Exhibit 3**).  Mr. Lipsitt also stressed how terrible it would be for me if I 'blew the whistle' and got the authorities involved in what I felt was a conspiracy against me.

17. At the 3rd arbitration meeting, held Tuesday, October 29, 2013: I was summoned, again with my wife, to Rabbi Cohen for an update. Greenman, Mr. Schabes and Mr. Lipnitsky were present. At this meeting, Mr. Lipnitsky stated that based on the various bank statements which I had provided him, he calculated that over 4 million dollars' worth of transactions between 2008 and the October 2013 – were made within the Merkaz account.

18. I explained that most of the activity could be attributed to just two transactions, the refinancing of two buildings worth 2.4 million. (**Exhibit 4**) I also pointed out that these bank statements had nothing to do with Aish and the only reason to mention such information was inflammatory, aimed at impressing Rabbi Cohen with Mr. Lipnitsky's investigative abilities and lend the accusations credence and spite. However, Rabbi Cohen did not care to listen to any explanations.

19. As aforementioned, I had been directed previously by Rabbi Cohen to authorize the release of my wife's and my personal credit reports; at this point, Mr. Lipnitsky presented the "finding" of multiple credit cards open between me and my wife, all of which were perfectly legitimate and paid in a timely fashion -- no payment was ever made to these personal credit cards from Aish funds. However, Rabbi Cohen stated that 'only a thief would have 27 credit cards'. Greenman then stated that he had only one credit card, which he appeared to think spoke well of his character.

20. Rabbi Cohen then announced that his interim decision, under Jewish law, was that I put any funds to which I had access into an escrow under his sole control.

21. Thinking that this was compliant with Jewish law, I cooperated and approximately 2.4 million dollars, proceeds of mortgage borrowing only a few months earlier, (**Exhibit 5**) were wired out and put under Rabbi Cohen's control.

22. Days later, Rabbi Cohen further instructed me and my wife to sign over all real estate holdings to him as well. We were dismayed and shocked, but with Rabbi Cohen's threats about my daughter's wedding, at that point only days away, I felt that we had to follow his directives. I still held on to the belief that a thorough investigation would reveal that I had done nothing wrong.

23. During the first two sessions, Mr. Lipnitsky had presented no evidence against me, and kept making vague statements that his findings of executive compensation would be 'highly questionable' by certain law enforcement agencies. Mr. Lipnitsky told me that he was working on a 'defense' of the organization's practices and that if I approached any authorities, he would instruct Greenman and their legal team to lay the blame solely with me.  At that point, I already understood that what was going on was a premeditated attempt on my reputation, social standing, and financial assets; a conspiracy to which all the attendees of the so-called "arbitration" were party.

24. Days after my daughter's wedding, on Monday, December 2nd, 2013- I hired Mr. Dan Stein, Esq (Before entering private practice with Richards Kibbe, Mr. Stein, was working with the US AG office in the Southern district of NY.) to represent me at this 'arbitration'. Mr. Stein contacted Aish's attorney Schabes and requested a meeting, which Schabes insisted was to take place at Rabbi Cohen's home.

25. The last 'beis din' session took place on Monday, December 9th, 2013.  When Rabbi Cohen heard that I had brought in an attorney, and an 'outsider' at that, he became angry andbegan yelling things like, how dare I bring a non-religious person to his home and that he 'understood' what Mr. Stein came to represent. (**Dan Stein Affidavit – Exhibit 6**)

26. Mr. Stein requested to see the arbitration agreement and any relevant evidence that was presented in the prior sessions, but Rabbi Cohen insisted that he had to leave, so that session totaled about 15 minutes. No evidence of any wrongdoing was presented at that session.

27. On Dec. 12, 2013 Mr. Stein sent Rabbi Cohen and Mr. Schabes a formal revocation of the Power of attorney signed by the Fetmans. (**exhibit 7**)

28. In what appeared to be some form of retaliation, on Dec. 16, 2013, Rabbi Cohen awarded Aish HaTorah New York, Inc. $20,000,000 against Jacob Fetman (**exhibit 8**), relying on a 'report' from the forensic accountant, Mr. Lipnitsky, that states that Mr. Lipnitsky found that "at least 2.4 million dollars were stolen from Aish...".

29. Aish HaTorah New York, Inc, took that award by Rabbi Cohen and rushed to the  Brooklyn Supreme court to confirm the award.

30. Justice Demarest, of the Kings County Supreme Court, declined to hear any arguments about the evidence of the case, and did not allow depositions of key witnesses to these proceedings; instead choosing to focus on arbitration alone, without the context of the surrounding baseless accusations, fraud in the inducement which lured me to the arbitration, or the duress placed on me and my wife during the arbitration meetings.. Justice Demarest

eventually confirmed the award which is now being appealed.

31. In a related case, Merkaz The Center, Inc. Vs. Aish NY et al. Justice Demarest did eventually compel Mr. Lipnitsky to attend a deposition.(**Exhibit 9- Justice Demarest's Decision**). While being deposed, Mr. Lipnitsky from the beginning showed that this conspiracy was still ongoing.

32. Mr. Lipnitsky, an expert witness, a professional CPA and a Fraud Examiner stated multiple times that he had no records and no notes from any of the arbitration sessions, nor from the actual examination he conducted over a period of two months. (**Exhibit 10 Lipnitsky Deposition**).

33. Although at first denied by him, it is clear that Lipnitsky engaged in ex-parte communications with Rabbi Cohen, and was engaged in wrongful independent investigation prior to the issuance of the confirmed award. See p. 51 line 16 – p. 52 line 8; p. 54line 2 – 10; p. 66 line 3 – 20; p. 67 line 19 – 21; p. 127 line 7 – p. 129 line 10. Additionally, emails reflect that Lipnitsky knew that such ex-parte activity was ongoing, P. 87 line 11 – p. 90line 2, and that the Fetmans had complained to him about Rabbi Cohen's conduct. P. 108 line 7 – p. 109 line 244.

34. Lipnitsky also admits that the numbers he provided to Rabbi Cohen ex-parte subsequent to the final held session (pre-award) were "preliminary." P. 66 line 5 – 6; p. 150 line 17 – p. 151 line 3.

35. Lipnitsky admits that he does not know with certainty that respondent did not funnel the funds purportedly diverted from "Aish" accounts back to petitioner. Indeed, he admits that certainly some money was clearly deposited back to petitioner.

36. Lipnitsky admits that, contrary to Rabbi Cohen's award, confirmed by the Court, which states that "since the books and records that were examined since Mr. Fetman's employment make it likely to the examiner that approximately $20,000,000 was stolen from Aish Hatorah over the years . . .," Lipnitsky has no idea where the $20,000,000 figure comes from. P.53 line 7 – 9; p. 72 line 14 – p. 73 line 18, p. 151 line 6 – 7. Indeed, such an irrational award defies simple multiplication which Rabbi Cohen claims to have done.

37. Lipnitsky similarly admits the conspiracy with regards to Rabbi Cohen's award issued on December 19, 2013. P. 85 line 24 – p. 86 line 25.8. Lipnitsky admits that the award was rushed without warning because of my counsel Stein's purported behavior (p. 126 line 5 – 13; p. 69 line 19 – p. 71line 25), and also admits that Stein, who only attended the final fourth abbreviated meeting, held on December 9, 2013, never truly had an opportunity to

review Lipnitsky's findings. P. 130 line 8.

38. It is clear post-facto that Lipnitsky did not really conduct a legitimate forensic investigation. Lipnitsky claims he was never tasked with writing a report. pp. 59, 51. Indeed, Lipnitsky never even knew which companies were owned by Aish, pp. 45, 46, 49, 50, 56 - 57, never spoke to various Aish accountants, or even sought to review basic documentation filed with the IRS. p. 95, 99. When asked about documentation and specifics about his methodology, he gave evasive answers especially regarding records, p. 26. He admitted to Aish's practice of paying abnormal benefits as part of employee compensation, P. 98,104, 106.

39. It is now also abundantly clear that no one has seen this alleged forensic report, especially not Fetman or his counsel. Aish HaTorahl refuses to produce it to Fetman or his counsel— the most egregious of due process violations in the context of a $20 million award and now judgment.

40. As a result of the EBT of Mr. Lipnitsky and the inconsistencies and apparent lies and deception, Justice Demarest ordered Aish and Lipnitsky to produce any 'report.' Only in May 2015 was this 'report' produced. Justice Demarest was the first one to realize that the 'report' is dated December 17th, 2013 – the purported date of the award by Rabbi Cohen. She also was dismayed at the fact that this report was not shared with me or my attorneys.

41. The report is false and was 'written to order' – at a cost of $100,000! Based on Lipnitsky's testimony.

42.

> In this 'report' (**exhibit 11**) Lipnitsky states that his findings cover the period of 2006-2013. His analysis, summarized as follows:
>
> 1. Unauthorized compensation - $174,202
>
> 2. Funds deposited into "Unauthorized" bank accounts: $ 1,697,523
>
> 3. Credit Card charges Personal - $ 462,787
>
> 4. Other $16,700
>
> Total: $2,351,211 - This was the closest that Lipnitsky was able to get to the $2.4 million that Rabbi Cohen asked for as this was the amount he had in escrow.

43. The report is dated December 17th, 2013 however, the award from Rabbi Cohen is actually dated Dec. 16th, 2013

44. **Unauthorized compensation** states that two schools were paid as a part of Allowable

Compensation: Masores BY - report claim $ 161,942 however - as can be learned from the school's report (**Exhibit 12**) $131,473 was paid (difference of $30,469).

45. Another school, Tiferes Yisroel - Lipnitsky report claims $ 94,242 however as can be seen from the school's report (**Exhibit 13**) only $ 58,403 was paid (difference of $ 35,839); Additionally, Health insurance premiums, totaling $ 95,733 were NOT counted as a part of the compensation package. Furthermore, Fetman's compensation 2006-2011 did NOT stay the same but was increased annually. 2012 - 2013 total compensation was $135,000 and not $125,000 as it shows on the report. Therefore - there is no basis to the claim of unauthorized compensation.

46. Lipnitsky's report refers to a total of seven bank accounts as **"Unauthorized bank accounts"; Project Inspire** (Bank of America X4050) total deposited $1,200,052 **Tomchei Torah** (Bank of American X4322) total deposited $ 262,923 Jewish Speakers Group (Bank of America X8362) total deposited $ 64,581 Ahavas Israel (Bank of America X4513) Total deposited $ 4,975. Three other accounts are referenced - **Aish International** - depositing funds totaling $ 139,967 into Merkaz account (Bank of America X5468) **Aish Missouri** - depositing funds totaling $ 15,025 into Merkaz account (Bank of America X5468) and **Aish Center** - depositing funds totaling $10,000 into Merkaz account (Bank of America X5468). the last three entities (Aish International, aish MO and Aish Center) are separate and distinct 501c3 organizations, with their own board, management teams and accounting departments. These entities are NOT under Fetman's control and never were. Its misleading and a complete falsehood to report these transactions as if they had anything to do with Aish NY. Certainly, Mr. Lipnitsky never even attempted to contact them as he stated in his deposition.

47. Additionally, **Project Inspire and Tomchei Torah are their own entities** - Project Inspire was ALWAYS under Aish International (**Exhibit 14, 15** ) had its own staff, address, board of directors and fundraising and accounting systems. Lipnitsky's letter even refers to email dialog between Greenman and Yossi Friedman, the director of Project Inspire, requesting that Inspire pay more money towards Fetman's compensation - clearly, Inspire is NOT under or a part of Aish NY Greenman claims that these accounts were 'unauthorized' yet clearly he knows and agrees to have Project Inspire use accounting services provided by Fetman. Greenman's claims that the Project Inspire bank account was unauthorized - is unbelievable - how else can checks made out to Project Inspire be able to be deposited?.

48. **Credit Cards transactions** reported to Lipnitsky by Aish as Personal - a total of $ 462,787 The report claims that EVERY charge at Staples was personal - approx. $200K over the 8

years! Likewise, charges from T-Mobile, Mountain Fruit, Home Depot, Lowes, Costco local coffee shops etc. are all marked as personal. I NEVER had an account with T-Mobile only with Sprint and those transactions were authorized by others as legitimate aish expenses and not a part of my compensation. Specific business transactions, such as over 10,000 dollars copier lease expenses charged by De Lage Landen, were marked as personal expenses. See lease attached. Simcha Kosher Caterers, which was an Aish caterer for an event in Austen Texas, were marked personal as well. Fetman was personally in charge of all purchases, and Aish staff *constantly* used Fetman's credit cards to have with them while on Aish run trips and student meetings. Many times staff meetings at local restaurants and eateries were charged to Fetman's credit card by staff. As much of the documentation is not available to us, we can not comment on the amex transactions. One credit card - Aish Plum card - which Lipnitsky's report claims to have $147,919 personal charges 2010 thru 2013 was analyzed and concluded to have a total charges of $585,400. When deducting returns and refunds of $16,755 and legitimate Aish NY business transactions of $558,827, only $9817 of personal charges over the 4 year period exist.

49. **Other Fetman Expenses**: $6700 over 2006 - 2013 Insurance payments to William Penn were authorized and not a part of Fetman's compensation.

50. One of the most egregious omissions is that in the letter, Lipnitzky acknowledges confirming that approximately $450,000 was deposited back in the Aish NY account from Merkaz. The report, however, failed to deduct that amount from the reported total, in order to reach the sum of $2.35 million.

51. The Fraud and conspiracy is still ongoing. In order to extort a settlement with Fetman, Aish and its representatives, including Lipnitsky and his current employer, Stout Risius, contacted Kings County District Attorney's office in or about Decmber 2015, a full year after this 'award' was issued, and filed a complaint against Fetman. Lipntsky gave the District Attorney's office a copy of the report (see lipnitsky testimony).

52. The Kings County DA office found this 'report' to be less than reliable and charged Fetman with stealing from Aish $237,477 (**Exhibit 16**). A "not guilty" plea was entered. Since then, the DA office, without any input from Fetman reduced the amount to approximately $140,000 (**exhibit 17 Sponakos email**)

### NATURE OF THE ACTION

This is an action seeking relief under claims of Civil RICO, conspiracy, misappropriation, fraud, deception, breaches of fiduciary duty and of obligations of good faith and fair dealing by the defendants in their part in the conspiracy to take twenty million ($20,000,000.00) Dollars from Fetman. The Defendants sought to obtain the same for themselves through their use of fraudulent, deceptive and self-beneficial actions and omissions, including a purported bizarre alleged Bet Din Arbitration Proceeding before Rabbi Cohen.

As a result thereof, the Plaintiff seeks to recover from the Defendants a sum sufficient to compensate him for all of its damages, and for the other injuries it incurred.

### FACTS COMMON TO ALL CAUSES OF ACTION

1. On October 13, 2013 Fetman and Greenman, and Sam Grossman went to an arbitration proceeding (bais din) before Rabbi Cohen, supposedly to determine a lease issue.

2. Rabbi Cohen apparently overstepped his bounds and took on the role of a party, rather than an impartial arbitrator, and began to abuse and accuse Mr. Fetman of colluding with Mr. Grossman for mutual benefit.

3. On October 22, 2013 Rabbi Cohen, in conspiracy with the other defendants, required Mr. Fetman to issue proof of available funds and or assets under his fiduciary control.

4. Fetman than sent to the accountant Mr. Lipnitsky, certain documents purporting to identify assets under his fiduciary control.

5. Rabbi Cohen insisted that all liquid assets be transferred to his escrow account, via irrevocable trusts and wires – thus preventing Fetman access to legal and forensic professional assistance.

6. On November 7, 2013, Fetman wired $152,500.00 from Merkaz- the Center, Inc. to Rabbi Cohen's escrow account per his instructions.

7. On November 12, 2013, Fetman wired another $347,500.00 from Merkaz -The Center, Inc. to Rabbi Cohen's escrow account.

8. On November 14, 2013, by direction and insistence of Rabbi Cohen, Fetman signed a document prepared by Schabes, giving irrevocable authority of plaintiff's Bayberry and Platinum Partners hedge fund accounts valued at approximately $1.8 million dollars to Rabbi Cohen.

9. The attorney, Schabes, represented to Fetman that he was working for Fetman, but was really working on behalf of other defendants.

10. Mr. Schabes is not licensed to practice law in the State of NY, but did practice law, and make legal arguments on behalf of defendant Aish, on at least three separate occasions at the arbitration hearings in the State of NY, in Violation of Judiciary Law section 478.

11. Fetman succumbed to the threats and extortion of the defendants and signed over the property of his fiduciary, which he didn't own, as he was pressured and intimidated by Rabbi Cohen.

12. It was claimed by Mr. Lipnitsky and his firm that he issued a report that there is proof that Mr. Fetman stole $2.45 million dollars from Aish.

13. On the basis of this report, Rabbi Cohen issued a determination that Mr. Fetman owed Aish NY the sum of $20 million dollars.

14. Mr. Lipnitsky uncovered many issues of diversion, embezzlement, and gross financial misconduct by Rabbi Greenman and other executives who are employees of Aish.

15. Many of these issues are the same as those revealed by Fetman to the Aish NY board since November, 2013 (EXHIBIT 18– emails to the board).

16. The Aish NY board did nothing about the diversion, embezzlement, and gross financial misconduct by Rabbi Greenman, and did not report them to the authorities, but instead authorized and approved of the scheme and enterprise to cover up the illegal acts of defendants.

17. The employer\employee relationship above mentioned formed a structure of the conspiracy.

18. Rather than report such fraud and misconduct to the board of Aish or anyone else, Mr. Lipnitsky, followed the instructions of Rabbi Cohen and/or Greenman, and chose to go along with this cover up, blaming Fetman for the missing money.

19. Rabbi Cohen also did not disclose his business relationship with defendant Aish, or that Greenman is a key member at his son's congregation in Passaic, NJ, and a major donor to his son's congregation.

20. Rabbi Cohen became a willing participant in this scam to extort, blackmail and defraud plaintiff and other entities.

21. On November 20, 2013 Fetman informed Lipnitsky and Schabes explaining that he was not the owner of the property sought by defendants, and that it belonged to a religious not-for-profit organization.

22. Mr. Fetman was told by Rabbi Cohen to sign the documents and "we will deal with the legalities later". **(Exhibit 19)**

23. The Aish board did not discharge their fiduciary responsibilities, and did not have any board meetings for years.

24. Greenman wired Aish NY funds out of the US, reported only a small portion of his income as salary, placed his wife on Aish payroll without reporting it to the board, or to auditors, and did not disclose it on the Aish form 990 filings.

25. Greenman lied constantly to Aish NY donors by substantially inflating the organization's budget and programming successes. Every donor report Aish NY had issued to donors was grossly inflated as to the financial results in order to induce donors to think that Aish NY had a much larger budget than it really had.

26. Greenman inflated Aish program 'successes' in order to have the donors think that the organization was much more efficient and successful than it actually was.

27. In at least one instance, Greenman solicited a donor to give money for a program that did not even exist, even though Aish NY had no capacity nor plans to get involved in that venture.

28. In July 2013, Greenman decided to sell real property at 83rd Street owned by Aish. Peter Hochfelder, the chairman of the board, and Greenman selected as the exclusive broker Hochfelder's brother, ignoring the clear conflict of interest.

29. The defendants embarked on a pattern of continuing illegal activity, by not holding board meetings, as the last Aish board meeting was in February of 2009, with no other meetings held through October 2013. This allowed the board to negligently or deliberately allow Greenman to defraud Aish and to cover up said fraud by stealing Fetman's property instead.

30. Also part of the continuing activity, the Aish board, cooperated with and conspired with Greenman, and allowed him to initiate fraudulent proceedings to steal plaintiff's property in order to conceal the fact that he was defrauding donors and the government.

31. Because of Greenman's personal and financial relationship with Rabbi Cohen, he was able to get Rabbi Cohen to hold a sham hearing and to extort Fetman to give away property and the property of other parties.

32. Schabes, Lipnitsky and Invotex were also recruited by Greenman and/or Cohen to provide a veneer of impartiality, when in reality, they were also part of the corrupt enterprise to steal money from Fetman and other parties.

33. Lipnitsky and Invotex (predecessor to Stout Risius Ross) purportedly investigated financial records and reported that "about $20 million dollars" was stolen by Fetman from Aish.

34. The reason defendant Cohen involved a lawyer and an accountant from Maryland in the arbitration, instead of local ones, was because Lipnitsky and Schabes were already part of the scheme and conspiracy, and were willing to lie and participate in the scheme.

35. Rabbi Cohen issued a ruling purporting to rely on the above findings of Lipnitsky and Invotex in order to seize and convert the property of plaintiff.

36. Schabes, Lipnitsky and Invotex also demanded payment from Fetman, and pretended to be representing him, though in reality they were not.

37. As such, all of the defendants embarked on a corrupt enterprise to conceal the crimes and misdeeds stated above.

38. Aish and the other defendants, aside from Fetman, have a common or shared purpose, in that the other defendants are all employees or agents of Aish, who endeavored to maximize their own profits, notwithstanding that Aish is purportedly a non-profit entity.

39. John Doe 1-15 are full time employees of Aish, and the other defendants are agents recruited into the scheme to conceal the defalcation of the funds by defendants by blaming the missing funds on Fetman and stealing plaintiff's property.

40. The role of John Doe 1-13 in the scheme was to cover up their own embezzlement and theft by blaming Fetman for the missing money and taking plaintiff's money in exchange. This was done under the auspices of Aish Hatorah NY.

41. The role of John Doe 14, Aish NY board member, in the scheme was that he ignored the diversion, embezzlement, and gross financial misconduct by Rabbi Greenman and other DEFENDANTS who are employees of Aish, reported to him by Fetman, and authorized the other defendants to proceed with their scheme. He also held undisclosed funds belonging to Aish in the account of Brahmen Capital, of which he is the principal.

42. The role of Victor Lipnitsky and Invotex (later Stout Risius Ross) was to conduct a sham accounting in order to purportedly find that Fetman stole money which was really stolen by Greenman, in cahoots with the other defendants. Their role was also to add a veneer of legitimacy to the false proceedings.

43. The role of Schabes was to pretend to be working on behalf of Fetman, while really working against him, in order to ensure that he gave up Plaintiff's property, and deposit it in Rabbi Cohen's escrow account, in cahoots with the other defendants. Their role was also to add a veneer of legality to the false proceedings.

44. The role of John Doe 15 was to conduct a sham arbitration proceeding as an excuse to steal plaintiff's property, in cahoots with the other defendants.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS -CIVIL RICO -18 USC § 1962(d)

1. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

2. The defendants had amongst themselves a planned and active enterprise to continue their theft and fraud from Aish, its board and its donors, and conceal it by blaming the missing funds on Fetman, and seizing plaintiff's property to cover their tracks.

3. The defendants formed an enterprise and associated together for a common purpose of engaging in the above course of conduct to defraud donors and Aish and the government, and blame it on Fetman and plaintiff.

4. Upon information and belief, this enterprise or organization is still ongoing. The defendants are still trying to conceal their theft and embezzlement and destruction of evidence.

5. Plaintiff was injured by defendants' conduct of this enterprise through a pattern of racketeering activity, as it resulted in the unlawful seizure and conversion by defendants of plaintiff's property.

6. Upon information and belief Greenman conducts the enterprise's affairs through an unlawful RICO pattern of activity.

7. The defendants have committed at least two predicate acts, when they repeatedly diverted donors' money from Aish, from donors, extorted property from Fetman, and practiced law in the State of NY without a license, all to cover up their own crimes.

8. Defendants have received income derived, directly or indirectly, from a pattern of racketeering activity to use or invest, directly or indirectly in acquisition, establishment, or operation of their enterprise.

9. Defendants agreed with one another to commit the acts of racketeering knowing that their conduct was violative of USC § 1962(c) and that they agreed to violate 18 USC § 1961(c), thereby violating 18 USC § 1962(d) as well.

10. Defendants knowingly agreed, consented to and conspired with one another to commit the acts of racketeering activity set forth herein knowing that their conduct was violative of 18 USC § 1962(a) and they agreed to violate 18 USC § 1961(a), thereby violating 18 USC § 1962(d).

11. Plaintiff is therefore entitled to treble damages pursuant to 18 USC § 1964(c).

12. As a result thereof the Plaintiff demands from DEFENDANTS (a) the sum of twenty million ($20,000,000.00) Dollars; together with (b) interest thereon from November 11, 2013 (c) continuing accrued damages, together with the costs of this action, and legal fees and expenses; and (d) punitive and exemplary damages in the sum of Ten Million ($10,000,000.00) Dollars.

## 2nd CAUSE OF ACTION - CONVERSION

13. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

14. Cohen knew full well that Fetman did not owe Aish NY any money.

15. Nonetheless, Cohen unjustifiably and baselessly ruled that Fetman owed Aish $20,000,000.00, and that Aish was entitled to "confiscate" plaintiff's real estate, pursuant to which ruling Aish is trying to enforce, following an Article 75 proceeding and confirmation.

16. By their aforesaid conduct, Aish wrongfully exercised dominion and control over the assets, entitlements and benefits which belong to others.

17. Merkaz The Center, Inc. owned the Bayberry and Platinum funds at the time they were converted by Aish, not Fetman .

18. Aish exercised unauthorized dominion over the funds, which were specific and identifiable in that they came from two distinct mutual funds.

19. Aish NY should have left the funds in the possession and fiduciary control of plaintiff, but instead kept them, or attempted to keep them.

20. Defendants' actions as hereinbefore set forth constitute their conversion of money justly belonging to Plaintiff.

21. That as a result of Defendants' conversion as herein complained of, Plaintiff has suffered damages and losses to its detriment.

22. Defendants' actions and omissions were clearly in bad faith with gross disregard for Plaintiff's interests, in Defendants continuing pattern of behavior evincing conscious or knowing indifference to Plaintiff's rights and entitlements as well as those of others.

### 3rd CAUSE OF ACTION – FRAUDULENT MISREPRESENTATION

23. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

24. Cohen, Greenman, and others, all made misrepresentations and material omissions of fact which were false and known to be false by defendants, for the purpose of inducing Fetman individually and as a fiduciary, to rely upon said misrepresentations, and turn over property and records to defendants.

25. Defendants falsely accused Fetman that Fetman had used Aish credit cards for his own benefit.

26. The defendants, specifically Lipnitzky, misrepresented to Fetman, that plaintiff had embezzled the funds of Aish, that they had evidence of such embezzlement, and that Fetman would have to repay said funds or face prosecution, shame and public humiliation and opprobrium.

27. In reality, the theft was not by Fetman, but by other executives, and the said defendants knew that their misrepresentations were false.

28. The same defendants also falsely told Fetman that Schabes was impartial, and equally representing the interests of Fetman.

29. Lipnitsky repeatedly told Fetman that he was working on Fetman's behalf, as Fetman was responsible to pay his fees up to $20,000.00. Fetman reasonably relied on said representation in turning over to Lipnitsky private financial information of himself and his fiduciaries.

30. The misrepresentations included those from Aish and Cohen's assurance that he would "deal with the legalities later", when he never did nor intended to follow any legal norms.

31. Upon information and belief: the assurances were false when made, and were known by Defendants to be false.

32. Upon information and belief, the false representations of the Defendants were directed toward ensuring that they would be able to steal the property of plaintiff and his fiduciaries.

33. Fetman would not have allowed defendants to exercise any control over assets were it not for the deception, dishonesty, deviousness, malice, deceit and misrepresentations of the Defendants.

34. The Defendants' actions and omissions were clearly in bad faith with gross disregard for Plaintiffs' interests, in said Defendants' continuing pattern of behavior evincing conscious or knowing indifference to Fetmans' rights and entitlements as well as those of others.

35. Plaintiff was injured by the false representations of Defendants because Fetman relied on them to give his fiduciary's money to defendants.

36. In addition, defendants made the same misrepresentations to plaintiff's wife, Tammy Fetman.

37. As a result thereof, the Plaintiff demands from the Defendants (a) the sum of twenty million ($20,000,000.00) Dollars; together with (b) interest thereon from November 11, 2013 (c) continuing accrued damages, together with the costs of this action, and legal fees and expenses; and (d) punitive and exemplary damages in the sum of Ten Million ($10,000,000.00) Dollars.

## FOURTH CAUSE OF ACTION-RESTITUTION

38. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

39. By retaining the Plaintiff's fiduciary two million ($2,000,000.00) Dollars for their own benefit, the Defendants were unjustly enriched at the expense of Plaintiffs. Defendants, therefore, have conferred a benefit upon themselves that they have no entitlement to obtain from Plaintiffs.

40. Unless the said Defendants return plaintiff's property to Plaintiffs, the said Defendants will be unjustly enriched at Plaintiffs' expense.

41. It is against equity and good conscience to permit Defendants to retain the Plaintiff's property, while plaintiff had nothing to do with any arbitration and does not owe any defendant anything.

### FIFTH CAUSE OF ACTION AGAINST ALL OF THE DEFENDANTS - FRAUD

42. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

43. The defendants committed fraud in the inducement in bringing Fetman to the first arbitration session while he was under the impression that it was regarding a previously discussed lease problem.

44. The defendants, as well as Schabes, also falsely told Fetman that Schabes was impartial, and equally representing the interests of Fetman.

45. Defendants made their misrepresentations to Fetman and Fetman did rely on said misrepresentations.

46. Lipnitsky repeatedly told Fetman that he was working on Fetman's behalf, as Fetman was responsible to pay his fees up to $20,000.00. Fetman reasonably relied on said representation in turning over to Lipnitsky financial information of himself and plaintiff.

47. The misrepresentations included those from named defendents that Merkaz money would remain in Merkaz' account; and Cohen's assurance that he would "deal with the legalities later", when he never did nor intended to follow any legal norms,

48. Upon information and belief: the assurances were false when made, and were known by Defendants to be false.

49. Upon information and belief, the false representations of the Defendants were directed toward ensuring that they would be able to steal the property of plaintiff.

50. Plaintiff would never have allowed defendants to exercise anything to do with its assets. Fetman would not have allowed defendants to exercise any control over plaintiff's assets had it not been for the deception, dishonesty, deviousness, malice, deceit and misrepresentations of the said Defendants.

51. The said Defendants' actions and omissions were clearly in bad faith with gross disregard for Plaintiffs' interests, in said Defendants' continuing pattern of behavior evincing conscious or knowing indifference to Plaintiffs' rights and entitlements as well as those of others.

52. Plaintiff was injured by the false representations of Defendants because Fetman relied on them to give his fiduciary's money to defendants.

53. In addition, defendants made the same misrepresentations to Fetman's wife, Tammy Fetman.

54. On at least three separate occasions, Schabes practiced law in the State of NY, although he is not and was not licensed to do so. Schabes conspired with the other defendants, and falsely led Fetman to believe that Merkaz's money would be safely held in his escrow account or the escrow account of Defendant Rabbi Cohen.

55. Rabbi Cohen ordered Fetman to turn over to him Merkaz's money and that he (Cohen) would "deal with the legalities later".

56. At the same time Schabes and Lipnitsky led Fetman to believe that they were working on his behalf, when in fact they were not.

57. Upon information and belief, the assurances were false when made, and were known by Defendants to be false.

58. In fact, they were in league with the other defendants and conspirators in an ongoing enterprise to steal plaintiff's and his fiduciary's property.

59. Upon information and belief, the false representations of the Defendants were directed toward ensuring that they would be able to steal the property of plaintiff.

60. Plaintiff was injured by the false representations of Defendants because Fetman relied on them to give his fiduciary's money to defendants.

61. As a result thereof, the Plaintiffs herein demand from the Defendants (a) the sum of twenty million ($20,000,000.00) Dollars; together with (b) interest thereon from November 11, 2013 (c) continuing accrued damages, together with the costs of this action, and legal fees and expenses; and (d) punitive and exemplary damages in the sum of Ten Million ($10,000,000.00) Dollars.

## SIXTH CAUSE OF ACTION - REPLEVIN

62. Plaintiff repeats and reasserts each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein.

63. The money is wrongfully held by the defendants named.

64. The plaintiff seeks the inclusion in the order of seizure of a provision authorizing the sheriff to break open, enter and retrieve plaintiff's funds, but does not know at this time where they are located

## SEVENTH CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY

65. Plaintiff repeats, reiterate and reassert each and every allegation set forth in all of the other paragraphs herein, with the same force and effect as if fully set forth and alleged at length herein .

66. Schabes represented to Fetman that he (Schabes) undertook to receive and hold in escrow the Two Million ($2,000,000.00) Dollars belonging to plaintiff's fiduciary, as he was acting as attorney for Fetman.

67. Cohen represented to Fetman that he would impartially arbitrate and safeguard Fetman's and his fiduciary's property.

68. Schabes created a fiduciary relationship between himself and Fetman by representing that he would safeguard plaintiff's money.

69. Cohen created a fiduciary relationship between himself and Fetman by taking advantage of his position as a respected clergyman and supposedly impartial arbitrator, and representing that he would safeguard plaintiff's money

70. As such Cohen and Schabes had a fiduciary duty to plaintiff to safeguard all of his and his fiduciaries property that came into their hands.

71. Instead, they conspired with the other defendants to rob plaintiff by means of a rigged arbitration, and did, in fact damage plaintiff by stealing its property.

72. Plaintiffs have demanded compliance to no avail. Defendants continue to fail and refuse to comply with their obligations.

73. Defendants' actions and omissions were clearly in bad faith with gross disregard for Plaintiff's interests, in Defendants continuing pattern of behavior evincing conscious or knowing indifference to Plaintiff's rights and entitlements as well as those of others.

WHEREFORE, Plaintiff demands that Judgment be awarded to it on each cause of action as hereinbefore set forth, together with interest thereon, and such other legal and equitable relief as the Court may deem to be just and proper under the circumstances, and that, in particular, Plaintiffs be granted Judgment:

On the first Cause of Action, the Plaintiff demands a Judgment against Defendants for twenty Million $20,000,000.00) Dollars; together with (b) interest thereon from November 11, 2013 continuing accrued damages, together with the costs of this action, and legal fees and expenses; and (d) punitive and exemplary damages in the sum of ten Million ($10,000,000.00) Dollars.

On the Second Cause of Action, the Plaintiff demands a Judgment against Defendants for twenty

Million $20,000,000.00) Dollars; together with (b) interest thereon from November 11, 2013

continuing accrued damages, together with the costs of this action, and legal fees and expenses; and (d)

punitive and exemplary damages in the sum of ten Million ($10,000,000.00) Dollars.

On the Third, Fourth, Fifth, Sixth and Seventh Causes of Action, the Plaintiff demands a Judgment

against Defendants for Twenty  Million ($20,000,000.00) Dollars; together with (b) interest thereon

from November 11, 2013 continuing accrued damages, together with the costs of this action, and legal

fees and expenses; and (d) punitive and exemplary damages in the sum of ten Million ($10,000,000.00)

Dollars.


Dated:  Oct. 16th, 2015

Brooklyn, NY


Jacob Fetman



**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 16 day of October, 2015

Name: Jacob Fetman

Signature of Plaintiff:

Mailing Address: 1743 Ocean Ave. Brooklyn NY  11230

Telephone Number: 646-261-0200